## GEORGE v YORKSHIRE TELEPHONE CO

Ohio Appeals, 2nd Dist, Darke Co
No. 359. Decided June 24, 1931

L. E. Kerlin, Greenville, for George.
T. A. Billingsley and G. W. Porter, Greenville, for Yorkshire Telephone Co.

KUNKLE, J.

The principal feature urged by the plaintiff is the appointment of a receiver to take charge of and manage the affairs of this company.

In passing, we may say, that our observation and especially our experience in managing and in liquidating companies by means of a receiver have not been very satisfactory. Our observation and experience have shown that where companies are either managed or liquidated by means of a receiver there is little, if anything left after the expenses incidental to such liquidation are paid.

The following rules are announced relating to applications of a nature somewhat similar to those involved in the case at bar, namely:

Fletcher's Cyclopedia—Corporations—Vol. 8, p. 8854 states the rule as follows:

"On the other hand again and again, courts reiterate that the power to appoint a receiver should be exercised with great care and the utmost caution and only in case of an emergency especially where the corporation is solvent. As said in one case, a receiver will not be appointed at the suit of a minority stockholder unless the danger of a loss or injury to the rights of the plaintiff is clearly proved, and the necessity and the right for the appointment of a receiver free from reasonable doubt.' The reason why a receiver should not be appointed except in extreme cases is that it impairs the credit of the corporation, interferes with its management and imposes upon the court the onerous duty of corporate management which it is not qualified to perform and which it should not undertake except in extreme cases."

Page 8866 of Fletcher announces the further rule:

"It is a settled rule that minority stockholders cannot have a receiver appointed where the only ground is as to the internal management of the corporation, where the acts relied upon are neither ultra vires nor fraudulent. So dissension among directors,

so long as a majority of them control, is not ground."

In Thompson on Corporations, Vol. 8, p. 437, the following is found:

"The receivership may be denied where it is not shown that the applicant will sustain irreparable loss by refusal to appoint or where the complainant has an adequate remedy at law; or where it is clear that no advantage will result from the appointment; or where it will result in the destruction of the corporation; or the applicant may receive complete protection through an injunction."

At page 439 of the same work the following appears:

"Where the corporation is a going concern a receiver should not be appointed at the instance of minority stockholders or bondholders, unless the rights of all the parties will be best served by such an appointment."

At page 454 the rule is further announced:

"The appointment of a receiver cannot be demanded as a matter of right, but the question of whether or not a receiver will be appointed in a given case is addressed to the sound discretion of the court under all the circumstances, and the action of the court will not be interfered with unless it is manifest that this discretion has been abused. The discretion must, however, be governed by legal and equitable principles, the violation of which will amount to its abuse."

In brief, it appears from the record that the plaintiff, J. W. Heckler is receiving a salary for all the services performed by him for the company of $75.00 per month and that his son is receiving a salary of $50.00 per month for the services performed by him.

These services are set forth in detail in, not only, Volume 1 of the evidence but particularly so in Volume 2 of the evidence from pages 5 to 51.

The above amounts include payment for all the services both as officials and otherwise rendered by these persons to the company. They include all the compensation paid by the company for official services. When the nature of the services so rendered is considered we would not feel warranted in holding that they were so ex-

cessive under the circumstances as to warrant a court of equity in interfering. If any compensation is to be paid for these varied services of the said officers, we do not see how a court of equity can hold that the compensation allowed such officers is so excessive as to justify a court in holding that the board of directors of said company violated the discretion vested in such board to fix the compensation of its officers.

The testimony of the witness, Frank M. Oldiges at page 51, etc., of Volume 2 of the record and of the witness, George Martin at page 62, etc., of Volume 2 of the record is to the effect that the amounts so paid to Heckler and his son are reasonable when the nature of the services rendered by them is taken into consideration. These witnesses are fully qualified by reason of the nature of their work to express an opinion upon this subject. Their testimony really constitutes the only testimony upon that subject.

The plaintiff who is seeking to place this company in the hands of a receiver is the president and manager of the North Star Telephone Company. His testimony is found in detail in Volume 1, page 91, etc., of the record. He admits on page 82 of the record that the North Star Telephone Company is a company engaged in work similar to that of the Yorkshire Telephone Company in adjoining territory. In other words the company of which he is now president and manager, while smaller in size and number of stations, is a business rival of the Yorkshire Telephone Company. This being the case, a court of equity should carefully scrutinize the testimony before placing the corporation in the hands of a receiver at the instance and behest of a rival company. The plaintiff claims to be the owner of a large number of shares of stock in the Yorkshire Telephone Company. Nevertheless, on page 105 of the record the following questions were asked of the plaintiff:

"Q. Now of those (shares) that have been transferred to your name, only 20 shares have been purchased outright?
A. 20.
Q. That is purchased on the basis of $2.50 per share.
A. That would be $2.50 per share. Let me see J. B. Grilliott's."

On page 104 the following appears:
"Q. 760 shares subject to condition. How many did you actually purchase outright?
A. 70.
Q. 70 shares. You own unconditional all

those that were purchased from what parties?"

It is difficult to determine from the plaintiff's testimony how many shares of stock he does really own and how many are held in his name conditionally. However, that may be it is apparent from the record that the shares of stock held outright by the plaintiff is comparatively small in amount when compared with the amount transferred to him for the purpose of bringing this suit.

It appears from the testimony of plaintiff at pages 99, 100, 101, etc., that the plaintiff, at the time he either purchased the stock which he actually owns or secured conditionally, knew the exact condition of the Yorkshire Telephone Company which he now seeks to place in the hands of a receiver. On pages 99, 100 and 101 the following questions were asked:

"Q. And before you purchased the stock you knew that Dr. Heckler and his family held controlling interest, did you not? A. Yes, I knew that.

Q. Had you before that time made any inquiry into the financial condition of the Yorkshire Telephone Company?

A. Well, I don't know whether I made inquiry or whether the information came to me without the inquiry.

Q. Did you examine any of the annual reports filed with the Public Utilities Commission?

A. Well, just immediately before that, yes. sir.

Q. That disclosed the amount paid in the way of salaries? A. Yes.

Q. And overhead? A. Yes.

Q. And notwithstanding all that information you still went on and purchased the minority interest?

A. You bet I did. The widow came to me with tears in her eyes; that is the reason, I did, yes, sir."

And at page 101:

"Q. Now, then you knew about what the overhead and operating expense was when you bought all this didn't you?

A. That is operating, total operating expense you mean?

Q. Yes. You had examined these reports, or a report to the Utilities Commission? A. Yes.

Q. And that disclosed this situation, didn't it?

A. Yes.

Q. And notwithstanding that you purchased the stock?

A. Yes.

Q. And these were $10.00 shares, were they not?

A. Yes, $10.00 shares.

Q. Well, what was the price you purchased these approximately 800 shares per share?

A. Well, what I purchased outright was $5.00 per share.

Q. $5.00 per share?

A. That is based on the original.

Q. Oh, that is of the original $10.00 issued? A. Yes.

Q. And based on the present outstanding stock would be at the rate of $2.50 per share? A. $2.50."

Without attempting to quote further from the testimony, we are of opinion that the plaintiff has not shown such facts as would warrant this court in appointing a receiver for the company or of granting any other relief.

If the failure to pay dividends during these times of depression constitutes a ground for the appointment of a receiver, then we fear a large per centage of corporations would not be free from such proceedings. The petition of plaintiff will be dismissed.

HORNBECK, J, concurs.

ALLREAD, PJ, dissents:

This is a small corporation and its field of operation is limited. During the period wherein the stock was held by independent owners the principal salary was that of the local manager who received and still receives $100 per month. The president and vice president held purely nominal salaries. Small dividends were then paid stockholders. Since the president and his family have acquired a majority of the stock these salaries were on January 4, 1924 increased as follows, the president and general manager $75 per month; secretary and treasurer $50 per month; John Hixon $100 per month the same as on page 48 of this book and extra provision that extra help should be subject to the approval of the manager. These salaries amount to the total sum of $2700 per year. Since the acquisition of the majority of the stock by the president and his family and the raising of the salaries, as above stated, the stockholders have received no dividends and the plant has become dilapidated and out of repair. It appears that the president of the company has removed to Greenville, a distance of some 20 odd miles from Yorkshire and that the last meeting of the board of di-

58

rectors was called by the president and notices were issued only to him and the members of his family. The meeting was held in pursuance of such notice in the city of Greenville. This meeting, in my judgment, was illegal.

I cannot escape the conclusion that these salaries are excessive for a small corporation like the present one and that the board of directors in fixing the salaries of the president and other officers abused their discretion. In my judgment, a large part, if not the whole increase of salaries should be refunded to the corporation and placed in a fund for the restoration of the plant. There is no reason at the present time for the appointment of a receiver.